We are going to hear the second case of the day, AFM Mattress v. Motorists Commercial Mutual Insurance Company. It's case number 21-1865. The defendant's 12B6 motion to dismiss was solely based on a virus exclusion that is contained or was contained in the policy, and we are seeking reversal of the district court's order on two issues. One of the issues is did the district court err in dismissing AFM's complaint for losses caused by actions of governmental authorities as opposed to actions for losses caused by a virus pursuant to the civil authority slash business interruption coverage contained in the policy of insurance. So, Mr. Udell, let me just start you out on the virus exclusion part as opposed to the regulatory estoppel. You have to admit, I think, that the weight of authority in the country is pretty strongly against the position that you're arguing, whether we focus on the virus exclusion and its applicability to all forms of coverage, or if we zero in on the civil authority language, which calls for damages to property other than the property at the premises and responding to dangerous physical conditions. And courts have found that this is just an ill fit for what the SARS-CoV-2 virus has done. So the first point is that the virus exclusion applies to all coverage, so why not just end there? And secondly, how do you show that the other courts are all wrong about the scope of the civil authority clause? Well, let me address the issue of how I deal with what other courts are doing. First of all, courts are interpreting policies of insurance that all have varying language in them. And so we have seen virus exclusions. We have seen policies that actually have coverage for various viruses. We have seen all types of different language. And so, in my opinion, it's very difficult to generalize and say that courts across the country are ruling in cases one way in favor of the insured or in favor of the insured. There have been cases that have fallen both ways. I will agree with Your Honor that based upon a review or a perusal of most of the cases in the United States that have been filed, and there haven't been a significant amount of cases that have been determined at the appellate level, but most of the cases in circuit courts and district courts have fallen in favor of the insurer and against the insured. But again, the policies are so radically different in one case to the next that it's very difficult to say we're just going to adopt this general principle that this is what courts are doing. There are also courts that have not, at this stage of these cases, dismissed these on summary motions. So, you know, that's the one issue. With respect to the virus exclusion, as Your Honors know, when interpreting policy language of contracts of insurance, the policy language is to be interpreted in favor of the insured and against the insurer, and all well-pled facts are to be taken as true. If there's ambiguity. Now, of course, if there's no ambiguity, there's another principle of interpretation that says you should apply the policy as written. In that sense, it's a contract. I agree that when a trial court is asked to look at contract language, it's an issue for the court, not an issue of fact for trial, as to whether or not that language is ambiguous. And if the trial court makes a determination that the language is not ambiguous, the trial court can obviously rely on the fact that there's no ambiguity and rule is a matter of law. Right. So let's look at this virus exclusion, which in your case, I mean, I'm not sure I agree with you that the policies are so different because actually language gets picked up all over the country, but suppose they are. But in your case, it applies to, quote, all coverage under all forms and endorsements that comprise this coverage partner policy. And then there's a bunch of things, including it's dot, dot, dot, business income, extra expense, action of civil authorities. So where's the ambiguity there? I mean, it applies to everything, right? Well, we're not we're not using we're not asking the insurer to pay for losses that are the result of the virus. We are using the virus for a very different a very different tool and trigger under the policy of insurance. So the virus endorsement or exclusion in this policy states that motorists will not pay for losses caused by or resulting from a virus. Right. We are alleging in our complaint that our losses were caused by civil authority and government action. But Mr. Udell, the stay at home orders were issued to combat the virus. I understand. I understand and agree that the shelter in place order issued by Governor Pritzker and the governor of the state of Indiana were put in place and is indicated within those orders in some part as a response to the pandemic and the virus. But it was the part. I mean, what do you think they just would have thrown a stay at home order out of the virus? Hadn't been there? No, I do not. No, no, absolutely not. I agree that the shelter in place orders were put in place as a result of the pandemic. Right. Okay. I think that the law was was one resulting from the virus itself. Correct. I understand that the civil authority and government action was the result of the virus, but I'm not you. I'm not asking to trigger. I'm not asking for the virus to act as a trigger to coverage here. It's the result of the civil authority and government action in the closure of businesses that gives rise to the damage that my clients are claiming. It's not damage directly from the virus. The damage is as a result of the shelter in place orders. Not all states had shelter in place orders and closures of businesses at all. And some states had shelter in place orders and closures of businesses that did not affect insureds like our insured was affected by the shelter in place orders in this case. So we're we're using the virus to trigger the personal property damage requirement in order to even get to the business interruption coverage in the policy, because in order to trigger the business interruption coverage, you have to have a covered cause of loss and a covered cause of loss means you have to have personal property damage. And I'd like to add and how was I mean, I don't even see how that exists. The virus is there, you know, in the air in the world, but I don't see how the problem was damaged to personal property as opposed to simply people's exposure to a potentially dangerous agent. First of all, I'd like to add, and I understand this is de novo review, but in the in the trial court, the defendant did not raise the issue of personal property damage resulting from the virus and the fact that that was not sufficient to trigger a quote covered cause of loss under the policy of insurance. But they did argue that this virus exclusion covered everything, all coverage. And then it goes on forms or endorsements that cover action of civil authority. So you've admitted that the closure orders of the two governors were prompted directly by the pandemic by the existence of the virus. And it was an effort to keep the virus from spreading from person to person to person. And I don't see how that's not enough to tie the existence of the virus to the action of the civil authorities for purposes of this exclusion. Well, I appreciate what you're saying. But again, what what I'm submitting is that the issue needs to be bifurcated. Again, we're not claiming that the virus was the direct cause of our damage. We are claiming and there is coverage in this policy for civil authority. So there is coverage if the government takes action that essentially closes your business. There is supposed to be coverage in this policy of insurance. We are not claiming that the virus was the direct cause. I agree that there's some interconnection between the virus and the shelter in place orders that were issued by the governors. But it's the direct effect. It's the collateral damage to my clients from being closed as a result of the government saying you must close your business. The government said you must close your business. People cannot come into your business. And we are ordering everybody to stay at home. I don't disagree that that's a result of the pandemic. But the policy of insurance in the exclusion only applies to the payment of money is excluded. If we are claiming losses directly from a virus or bacterium, which is not what we're claiming, we are claiming losses as a result of government action. And yes, that government action was premised in part or I shouldn't say in part in whole on the pandemic. And again, I don't I don't disagree with that. But we're not claiming that that the virus itself caused damage to mattresses in the store. And therefore, we want money for those mattresses that were damaged. It's not like which the defendant brings up. You know, there there could be a fire to trigger the personal property damage covered cause of loss in the policy that that's not what we're claiming. And so I think that you need to bifurcate the issue of what the exclusion actually applies to. And I'm running out of time. So I would like to quickly address the issue of how we even got the virus exclusion injected into these policy policies of insurance. So there's a company called ISO, which is Insurance Services Office Inc. And they author forms of CGL policies to be submitted to various departments of insurance all over the country. ISO submitted forms to the Illinois Department of Insurance that are generic forms that insurers that issue CGL policies in this state can opt in to use as policies of insurance to their insurers. What happened here is in order to modify the ISO forms with the Department of Insurance, ISO needs to submit a petition to the Department of Insurance in Illinois, which it did, asking and telling the Department of Insurance that they want to modify a CGL policy. The reason that they're required to do this is if they're pulling back or withdrawing existing coverage from the form policy, the Illinois Department of Insurance will mandate that the insurance companies reduce the rates from the rate card that they're allowed to charge because they are taking away existing coverage. If, however, they are clarifying existing coverage by changing the form, there is no rate change that's applied to the insurer. So in this particular case, as a result of the SARS pandemic, there were numerous, hundreds of millions of dollars of business interruption claims that were processed and paid by the insurance companies. Back in 2006, 2007, ISO petitioned the Illinois Department of Insurance that they wanted to clarify existing coverage, not modify. And they indicated that they were just clarifying existing coverage as opposed to taking away coverage from the policy of insurance. But they were perfectly clear about what they wanted to put in, and they have remained consistent about that. So I'll make that be my first point. My second point is that your opponents respond, well, maybe there were some payments for the SARS-1 virus, but the overwhelming response of the industry was consistent with what this statement was. In fact, coverage was denied. Yeah, but the reality is that's not what they did. They didn't just clarify existing coverage because they had previously paid out hundreds of millions of dollars of claims under that coverage. That's the question. How much did they pay out? Maybe they paid out on a policy too, but as you just finished telling me, policies are written differently. I get it, but these are factual issues to be decided by the trier of fact at trial. We never even got there because we think that the trial court incorrectly held that regulatory estoppel is something that Illinois courts have never looked at, never adopted, and that's all been briefed in our papers, and I know I'm out of time. So thank you very much for listening to me, and we respectfully request that you reverse and remand. Thanks, Mr. Udall. I will give you some time for rebuttal. I reserve five minutes, but I understand I used that time. So any rebuttal that you'd like to give me, I will reserve. Thank you. Okay. All right. Mr. Hofer. Good morning, Your Honors. May it please the court, Patrick Hofer for Appley Motorists. Let's talk briefly about the regulatory estoppel issue because I believe that is a predicate issue for the court to consider. AFM does not contend that this virus exclusion is ambiguous, nor could it. It says we will not pay for loss or damage caused by resulting from any virus, and as you pointed out, Judge, that provision applies to all coverages, all forms, including the specific form of coverage they're asking for, which is action of civil authority. But, Mr. Hofer, they are reading this exclusion, I guess I'll say, in a way, with a very stringent causation requirement because they are saying that loss or damage caused by or resulting from any virus means like the mattresses themselves were impermeated with virus, not that the virus prompted the governor to take an action, which then in turn. So there's a causal chain that they break off at an earlier point than you do. Correct, and so Your Honor is referring to the language of the action of civil authority provision, and as Judge Shaw pointed out, it is imperative to read that language. The action of civil authority has to respond to some property damage other than at the insured property, and that damage has to be caused by a covered cause of loss. So we are required to look back further in the causal chain than the immediate cause under the policy language itself. We have to look at what was the cause of damage that the civil authority responded to in order to cordon off the area around the insured property. If it's not a covered cause of loss, it's not covered. And, of course, a covered cause of loss is any cause unless excluded, and the virus exclusion says it excludes loss or damage caused by resulting from a virus. Do you think regulatory estoppel would help AFM here? No, Your Honor, it would not. Of course, this court is not free, sitting in diversity, to adopt a new theory of law for Illinois. But even if the court were willing to read the tea leaves and consider whether Illinois would adopt that theory, it would not apply here. Under any reading of that theory as adopted by any state. In New Jersey, for example, the originator of this theory, the Supreme Court made clear the estoppel only applies to the extent that the representation to the regulator is inconsistent with what the insurer is currently arguing to the court. And as applied to virus exclusions, including this very form of exclusion today, so far 10 New Jersey courts have rejected application of New Jersey's regulatory estoppel theory to the COVID-19 situation. There are 20 cases that have rejected it in Pennsylvania, also one state that has adopted this theory. So even adoption of the theory, which the court is not free to do, wouldn't help AFM because it doesn't apply on the facts. I take it. Well, I mean, is the bottom line that the misrepresentation, if there was any, would have been to past practice, not to the reach of this policy language? Is that your argument? As every court that has considered it, Judge Koukouras just recently said the same thing a few weeks ago. We submitted that in our 28J letter. Yes, the representation at issue has to be how will this provision apply? Because in order for an estoppel to exist, one has to change position to one's detriment. So there has to be representation about how this provision will apply going into the future. And there's no inconsistency about what was told to the regulators in 2006 about how this virus exclusion would apply and what Motorists was arguing to the court today. We were very clear, or ISO was very clear, this would exclude any loss or damage arising out of a virus. And that is the same situation today. Could I just interrupt you and ask whether there's a principal-agent relationship between Motorists and the Insurance Services Office? What is exactly the link between you two? It isn't sufficiently pleaded, Your Honor. We would not, if this were remanded, we would want to seek a 12C motion ruling that the pleading does not sufficiently plead a principal-agent relationship. But for purposes of the motion that we made to the district court, we accepted the allegation because the virus exclusion is such a clear result for no coverage here. But let me – for the court's benefit, I can say without – this is outside of the pleadings. My client doesn't – ISO is separately owned. It's not controlled by the insurance companies. It licenses its language for a fee. And so insurance companies do not control what it does. So – and Judge Rovner, the question whether the representation was even false. The representation at issue was property policies generally do not cover business interruption loss arising from the presence of a virus or a microorganism. Over 500 cases have been decided in the last 18 months as applied to the SARS-CoV-2 virus. And many of those cases didn't even have a virus exclusion. So if you took the virus exclusion out of the equation, the truth of the statement made to the regulators becomes evident. Hundreds of cases agree with what was represented to the regulators back then. This form of property policy doesn't provide coverage, but the virus exclusion makes it even more clear. And that's what was represented to the regulators at the time. Therefore, there can be no estoppel. Now, if I may, I would like to address further the question of the – whether the virus exclusion applies. As we discussed, the virus exclusion excludes loss or damage caused by or resulting from any virus. It was Judge Kendall in the Rosebud decision just a few weeks ago who emphasized in her opinion that the same exclusion, that the insurance loss certainly resulted from the coronavirus. So however one looks at the causation analysis, whether we look at Illinois law on efficient proximate cause, we don't need to go there because the policy already defines where in the causal chain we look. We look at the beginning. But even if you look at Illinois law on that point, the dominant cause, the efficient proximate cause, the one that sets all the other causes in motion without intervening interruption is the virus. And even if you look at the language of the exclusion caused by or resulting from, many courts have noted resulting from is broader. And as we heard from my friend at the bar, yes, these orders definitely were resulting from the coronavirus. So however one looks at the causation issue from multiple perspectives, the loss here was caused by or resulted from the SARS-CoV-2 virus and therefore is excluded. I point to the decisions of your sister circuits. The Ninth Circuit in Chattanooga concluded under nine states law there is no basis for regulatory estoppel. Under the tenth state at issue, West Virginia, which had adopted regulatory estoppel, Chattanooga decision held the theory would not apply on these facts. There are 64 cases around the country and counting that have rejected the concept of regulatory estoppel as applied to the coverage issues here. I've mentioned a few of them. Your opponent argues that this Columns case from the Illinois court does actually move in that direction. Yes, Your Honor. And so Columns stands for a very different principle. Columns cited and discussed the Morton case for a different proposition, which was the history of pollution exclusions and liability policies in general. It didn't discuss regulatory estoppel. It didn't mention it. It's not even a principle at issue in Columns. And AFM also stretches in order to argue that Columns used regulatory history in order to find an ambiguity in the policy. And again, that's just not so. It kind of stretched to find an ambiguity, though, it seems to me. Well, so in that case, at issue was an absolute pollution exclusion as applied to indoor discharges of pollutant, carbon monoxide. And the court said as applied to those facts, we believe there's an ambiguity. And then it turned to the regulatory history to determine the intent. But that is not the other way around, which is how AFM characterized this decision. That is, one first looks at the regulatory history to conclude there's an ambiguity and then read the language with that purpose. Here, this language is clear. Everyone agrees this language is clear. In other cases, policyholders argue to insurers using different forms of a virus exclusion, not the one at issue here, but a different form. They argue if the insurer had just used the form, this ISO form that Motors used in this policy, that would be clear. Everyone agrees this exclusion is clear. If it's clear under Elger and under Illinois law, we don't look at extrinsic evidence of intent. We apply the plain meaning. And therefore, the regulatory estoppel theory could never come into play. Unless there are any other questions from the court, we would ask that the orders of the district court be affirmed. Thank you very much, Mr. Hofer. Okay, Mr. Udell, come on up. He's on his way. Oh, thanks. Why don't we give you three minutes? Thank you, Your Honor. So I'd like to address the issue of regulatory estoppel and exactly the actions of the defendant that we allege in the complaint and what the insurance companies are actually asking courts to allow and this court to allow. So in 2006 or sometime in 2007, Motorists, the defendant, through ISO, submitted to the Illinois Department of Insurance a proposed policy endorsement, later included as the virus endorsement in the policy issued to my client. That endorsement was titled, quote, exclusion of loss due to virus or bacteria. And it was listed on a form entitled CP01-40-07-06. They specifically, in order to procure approval from the Illinois Department of Insurance for a clarification of existing coverage, represented that while property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious materials raised the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and create sources for recovery for such losses contrary to current policy intent. Their statement that policies had not been a source of recovery for losses from disease-causing agents in the past was absolutely false. They knew it was false. They knew historically it was false. And they made that statement to the Illinois Department of Insurance so they could get the exclusion approved as an amendment to their existing policy as opposed to a retraction of existing coverage so that they didn't have to lose premium money because the Illinois Department of Insurance would have forced them to lower the rates they were charging to their customers if they had truthfully told the Illinois Department of Insurance that they were taking away existing coverage. Can you please link that thought to the regulatory estoppel point? Because I thought regulatory estoppel was essentially about saying one thing at one moment to somebody and then saying the opposite later. And so legitimate reliance interests are frustrated. And your point, whether it's true or not, I'm having trouble linking. I'm not sure that I understand Your Honor's question when you say linking. Well, I mean, even if they said some inappropriate things, the Department of Insurance does allow them to use this policy. And no one has been inconsistent about what the virus exclusion means. Well, hey, I don't agree that no one's been inconsistent about what various virus exclusions and various policies mean. As I indicated before, I think that all these policies, while they might read similar to a layperson, there are granular differences in the policy language that affect what those policies mean. And again, I'm out of time. I apologize. So I'll just rely on our briefs with respect to what the court held in Cologne and the regulatory estoppel. Do finish your thought if you have something to add. Well, I was just going to add that I do think that the Illinois Supreme Court in Cologne did look to extrinsic legislative slash regulatory evidence in order to decide an issue with respect to policy coverage. And the insurance companies should be estopped from making representations to regulators to change coverage in policy forms when they're representing that this is just a clarification of existing coverage. They're not pulling away any coverage. And then you have thousands of policyholders that get stuck holding the bag that think they have business interruption coverage for something they don't have. If they knew the coverage was being taken away, maybe the insureds would have shopped for different coverage in the marketplace. But since they presumably just thought that there was a clarification of what they already had, they did nothing. Thank you for extra time, Your Honor. Thank you for the argument. And thanks to Mr. Hofer as well. And the case will be taken under advisement.